WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RONNIE D. STILWELL and COURTNEY STILWELL, ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | No. 3:12-cv-8053-HRH |
| CITY OF WILLIAMS, et al., ) ) | |
| Defendants. ) ) | [Prescott Division] |

O R D E R

Motions for Partial Summary Judgment

Plaintiffs move for partial summary judgment.[1]  This motion in opposed,[2] and defendants move for summary judgment on all of plaintiffs' claims.[3] Defendants' motions are opposed.[4]  Oral argument was requested and has been heard.

---

[1]Docket No. 133.

[2]Docket No. 147.

[3]Docket Nos. 145 & 146.

[4]Docket No. 152.

<u>Facts</u>

Plaintiffs are Ronnie D. and Courtney Stilwell.  Defendants are the City of Williams; Joseph and Lyda Duffy; Raymond Glenn and Elsie Cornwell; Billy and Bessie Pruett; and Kathy and Tracy Fuller.

Plaintiff Ronnie D. Stilwell (hereinafter "Stilwell") was employed as the City's Water Superintendent.  The City's Employee Manual provides that City employees are "at will" employees and that "[t]he employment relationship may not be changed from the 'at will' status by any document or statement, or by any employee of the City, unless such a change is specifically approved and adopted in writing by [the] City Council."[5]  The City's Employee Manual further provides that "[t]he City or the employee may terminate the employment relationship at any time for any reason whatsoever or for no reason[.]"[6]  Also, Section 1.04 of the City's Employee Manual provides that "[a]ll City employees regardless of type, are employees 'at-will', consistent with the public policy of the State of Arizona and as defined in Ariz. Rev. Stat. Ann. § 23-1501, <u>et seq.</u>"[7]  In addition, Article 9.03(a) of Ordinance No. 850, which was passed on January 26, 2006,  provides that "[e]mployees

_____

[5]City of Williams Employee Manuel [sic], Section 1.01(B), Exhibit 8 at Stilwell 140, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[6]<u>Id.</u>

[7]Exhibit P, Defendants' Motion for Partial Summary Judgment re: Employment Claims, Docket No. 145.

who do not have an individualized written employment contract are employed AT THE WILL OF THE CITY OF WILLIAMS and are subject to termination of employment at any time, for any reason not unlawful, with or without cause or notice."[8]

Section 7 of the City's Employee Manual sets forth an appeal process for disciplinary actions for classified employees.[9] Prior to January 2006, the Water Superintendent was a classified employee.  In January 2006, the Water Superintendent became an unclassified employee.[10]  However, Williams City Code Article 2.2.12(d) continued to provide that "[f]or purposes of personnel actions, the Water Superintendent shall be a 'classified' employee."[11]

On April 21, 2006, Stilwell acknowledged that he had received a copy of the City's Employee Manual and that he had "read it and will abide by the policy as set forth."[12]

---

[8]Exhibit N, Defendants' Motion for Partial Summary Judgment re: Employment Claims, Docket No. 145.

[9]Exhibit I, Defendants' Motion for Partial Summary Judgment re: Employment Claims, Docket No. 145.

[10]City of Williams Employee Manuel [sic], Section 1.02(A), Exhibit 8 at Stilwell 141, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[11]A copy of the relevant portion of the City Code is attached as Exhibit 9 to Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[12]Exhibit R, Defendants' Motion for Partial Summary Judgment re Employment Claims, Docket No. 145.

In 2008, Carolyn Smith, who was the City's HR director, filed suit against the City, Duffy, and others, alleging that she had been discriminated against because she raised concerns that Cornwell was being discriminated against because of his age. Stilwell was disclosed as a witness in the Smith case.[13] At his deposition in this case, Stilwell stated that he "was going to testify on what I observed Dennis Wells[[14]] and Joe Duffy, how they treated Carolyn Smith."[15] Stilwell was never deposed in the <u>Smith</u> case and never testified at trial. On August 13, 2009, he did, however, make a sworn statement regarding his observations of how Duffy and Wells treated Smith.[16]

On July 31, 2009, Stilwell was given a reprimand and an unpaid three-day suspension for installing a vehicle lift in the Water Department without first having received permission to install personal equipment on City property.[17] On August 10, 2009, Stilwell asked Susan Kerley, the City HR Director, if, as an unclassified employee, he could file an appeal of his suspension and if the City Manager could suspend him without the

---

[13]Plaintiffs' Third Supplemental Rule 26.1 Disclosure Statement, Exhibit L at 2-3, Defendants' Motion for Summary Judgment re Employment Claims, Docket No. 145.

[14]Dennis Wells was then the City Manager.

[15]Deposition of Ronnie D. Stilwell at 236:8-10, Exhibit M, Defendants' Motion for Summary Judgment re Employment Claims, Docket No. 145.

[16]Exhibit 3 to Third Affidavit of Ron Stilwell, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[17]Memorandum to Ron Stilwell, Exhibit 12 at Dft 387, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

City Council's approval.[18]  On August 10, 2009, Stilwell submitted an appeal to Kerley.[19]

On August 31, 2009, Kerley advised Stilwell that his reprimand and suspension were being

overturned.[20]  Stilwell avers that Kerley told him that "the disciplinary documents resulting

in the reprimand would be taken out of my personnel file and that I would receive back

pay for the 3-day pay loss."[21]

Stilwell avers that

> [s]hortly after my meeting with … Kerley on August 31, 2009
> and less than a week after the City of Williams and Duffy
> would have received a copy of my sworn testimony in the …
> Smith case, I began experiencing retaliation and adverse
> actions from Duffy and Wells in the form of failure to reinstate
> my three days of lost pay, failure to remove any disciplinary
> documents resulting in my reprimand from my personnel
> file,[[22]] and treating me rudely and hostilely….[[23]]

---

[18]Email from Stilwell to Kerley, Exhibit 10, Plaintiffs' Motion for Partial Summary
Judgment, Docket No. 133.

[19]Appeal of Reprimand Dated July 31, 2009, Exhibit 13, Plaintiffs' Motion for Partial
Summary Judgment, Docket No. 133.

[20]Deposition of Susan Kerley at 145:13-146:8, Exhibit 4, Plaintiffs' Motion for Partial
Summary Judgment, Docket No. 133.

[21]Third Stilwell Affidavit at 2, ¶ 2, Exhibit 1, Plaintiffs' Response to Defendants'
Motion[s] for Partial Summary Judgment, Docket No. 152.

[22]Stilwell avers that when he "reviewed [his] personnel file … in the summer of 2012,
[he] noticed [that] the reprimand and all disciplinary documents relating to the reprimand
were still … in [his] official personnel file."  Id. at 3, ¶ 5.

[23]Id.

At his deposition, Stilwell testified that Duffy treated him as "an outsider, refused to, to work with me; just basically made me feel not welcome at the city of Williams."[24]  Stilwell testified that Duffy would walk out of the room when he entered, give him dirty looks, and not even say good morning.[25]

On September 10, 2009, Stilwell's attorney sent "a letter to the City Manager's Office ... requesting that the harassment stop and that management, including Duffy, treat [Stilwell] with respect and thereby improve the conditions of [Stilwell's] work place."[26]

On September 15, 2009, Duffy sent an email to Wells and Kerley in which he reported that Stilwell had made an inappropriate gesture the day before in connection with his asking whether he needed to go do a UA.[27]  Duffy stated that "[s]ince [Stilwell] is falsely accusing us of hostile behavior, I think we should begin documenting all of his inappropriate behavior."[28]

---

[24]Stilwell Deposition at 236:13-15; Exhibit M, Defendants' Motion for Summary Judgment re Employment Claims, Docket No. 145.

[25]Id. at 237:19-238:3.

[26]Third Stilwell Affidavit at 3, ¶ 6, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment Docket No. 152.

[27]Exhibit 4 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[28]Id.

On December 24, 2009, Stilwell advised the City's attorney that Stilwell's attorney wanted him to "sign a 11 page declaration with regards to the Carolyn Smith[] case", that he did not feel comfortable signing the declaration, and that "[i]f at all possible I would like to be excluded from this case."[29]   In the email, Stilwell stated that his issues with Duffy had been resolved and that he and Duffy were "moving forward working as a team once again."[30]

Stilwell avers that "[a] motion to prevent [his] testimony" was "filed in the <u>Smith</u> case, but on June 1, 2010 the judge in the <u>Smith</u> case denied the motion, resulting in the fact I might be ordered to testify."[31]   Stilwell avers that he had a meeting with Duffy after the June 1, 2010 order was issued at which

> Duffy stated he preferred I could find some way not to have to testify.  Duffy specifically told me: 'I've got your back and you've got my back,' meaning to me that Duffy was attempting to coerce me to support him and the City regarding the <u>Smith</u> case by not testifying, and if that support was forthcoming, Duffy would take care of me in my job.[[32]]

---

[29]Exhibit 5 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[30]<u>Id.</u>

[31]Third Stilwell Affidavit at 4, ¶ 7, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[32]<u>Id.</u> at ¶ 9.

In August of 2010, Stilwell avers that he gave defendant Billy Pruett, who worked in the Water Department, two verbal warnings.[33]  The first verbal warning was for diluting wet samples.[34]  The second was for giving defendant Kathy Fuller, who was also an employee in the Water Department, preferential treatment; leaving blower belts on the floor of the waste water treatment plant (WWTP); failing to calibrate certain equipment; and failing to learn maintenance procedures for the WWTP.[35]  Stilwell avers that after he gave Pruett these two verbal warnings, Pruett "seemed to hold a grudge against [him] and was not [as] friendly with [him] as he had been in the past."[36]

Stilwell avers that it was also in August 2010 that he began to suspect that Pruett and Fuller were having an affair.[37]  On August 23, 2010, Stilwell emailed Kerley to ask for advice on how to handle the situation.[38]  Randy Stilwell, Stilwell's brother who also worked for the City, avers that he too believed that Pruett and Fuller were having an affair.[39]

---

[33]Id. at 8-9, ¶¶ 12-13.

[34]Id. at 8, ¶ 12.

[35]Id. at 8-9, ¶ 13.

[36]Id. at 9, ¶ 14.

[37]Id. at ¶ 15.

[38]Exhibit 26 toThird Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[39]Affidavit of Randy Stilwell at 1, ¶ 1, Exhibit 9, Plaintiffs' Response to Defendants'
(continued...)

In September 2010, Stilwell avers that at a meeting with Tim Pettit, another City employee, the subject of Stilwell's possible testimony in the <u>Smith</u> case came up and Stilwell told Pettit that if he were called to testify, he "would have to tell the truth about how Duffy and the former City Manager retaliated against [Smith] in order to try to get her to quit."[40] Stilwell avers that "[s]hortly thereafter I had another confrontational discussion with Duffy who expressed extreme displeasure with me for agreeing to testify if Smith called me to the witness stand. [Duffy] implied by actions and words that my job was in jeopardy."[41]

Stilwell avers that in October and November 2010, he continued to receive emails from Duffy and Wells, in which he was "accus[ed] ... of unwarranted poor job performance" and which "mad[e] [his] workplace unpleasant."[42] For example, on October 18, 2010, Duffy wrote a memo to Stilwell about the lack of security at the water plant and advised the City council that he gave the memo to Stilwell, even though Stilwell contends

---

[39](...continued)
Motion[s] for Partial Summary Judgment, Docket No. 152.

[40]Third Stilwell Affidavit at 4-5, ¶ 10, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[41]<u>Id.</u>

[42]<u>Id.</u> at ¶ 11.

that he never got the memo.[43]  Stilwell advised defendant Glenn Cornwell, who was

Stilwell's immediate supervisor, that he thought Duffy was doing things like this just to

harass him.[44]  Pruett testified that during this time, Stilwell did mention that Duffy and

Wells were "after him" but he did not recall why Stilwell felt that way or why Stilwell

thought Duffy and Wells were after him.[45]

On October 29, 2010, Stilwell emailed Cornwell about two Bearizona employees

making a rude gesture as he (Stilwell) was driving by.[46]  Stilwell avers that "Cornwell told

[him] to go to Bearizona in Williams to report this matter to the supervisor of these folks,

which I did that same day, with Mr. Pruett and Ms. Fuller as witnesses" and that he "acted

professional but concerned in making this complaint with a female supervisor of these

gentlemen...."[47]

---

[43]Exhibits 21, 22, & 23 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Summary Judgment, Docket No. 152.

[44]Exhibit 23 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[45]Deposition of Bill Pruett at 32:21-33:16, Exhibit 10, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[46]Exhibit 28 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[47]Third Stilwell Affidavit at 10, ¶ 18, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

On November 2, 2010, Stilwell told Cornwell that he was going to begin working on employee evaluations.[48] Stilwell avers that he "decided to write a negative [evaluation] for Mr. Pruett because of his August verbal warnings and his bad attitude in the workplace since that time."[49]  On November 27, 2010, Stilwell avers that he "discovered that the [Water Treatment Plant] was in serious disarray when it had been under the control of Billy Pruett and Kathy Fuller that day."[50]  Because of this, Stilwell "determined to make Mr. Pruett's job performance evaluation worse" and on November 29, 2010, Stilwell advised Cornwell that he was going to "[r]ewrite [the] employee evaluations[.]"[51]  Dan Curtis, a Water department employee, avers that "during the last month before Mr. Stilwell's suspension in December 2010, Mr. Pruett and Ms. Fuller were very angry at Mr. Stilwell by their actions, words used, and demeanor.  I remember that Mr. Stilwell ordered Ms. Fuller to do janitorial work on the weekends and to paint paddles, which she did not want to do."[52]

---

[48]Exhibit 30 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[49]Third Stilwell Affidavit at 10, ¶ 20, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[50]Id. at 11-12, ¶ 21.

[51]Id. at 12, ¶ 22; Exhibit 35 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[52]Declaration of Dan Curtis at 3-4, ¶ 8, Exhibit 8, Plaintiffs' Response to Defendants'
(continued...)

On December 9, 2010, Duffy wrote a memo to Kerley regarding a meeting he had with Pruett that day.[53]  Duffy told Kerley that Pruett "informed [him] that the employees of the department were afraid of their supervisor and of city hall.  They are being led to believe that their jobs were on the line and that everyone was after them."[54]  Duffy stated that Pruett was "representing the concerns of the employees within the department" and that Pruett had "felt that the stress level was so high that he was afraid he might have a heart attack."[55]  Duffy wrote that "[w]e've had indications in the past that Ron Stilwell managed his department with threats and intimidation, and that the department's work environment may be hostile."[56]  Duffy "recommend[e]d that [the City] conduct an investigation into these allegations to ensure that our employees are working in a safe environment."[57]  Pruett testified that he did not tell Duffy that he felt like Stilwell was trying to get him fired and that everybody in the Water Department felt like their jobs were on the line, that he had not been thinking of resigning,  that he was not concerned with

_____

[52](...continued)
Motion[s] for Partial Summary Judgment, Docket No. 152.

[53]Exhibit 12, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[54]Id. at 1.

[55]Id.

[56]Id.

[57]Id.

having a heart attack, and that he did not recall if he used the words "hostile environment."[58]

On December 9, 2010, Duffy also began a "log of events" relating to Stilwell.  The log shows that after talking with Pruett on December 9, Duffy got a call from the mayor, who had received a call from Vanessa at Bearizona, who lodged a complaint against Stilwell.[59]  Duffy spoke with Vanessa later that day and he also spoke with Fuller, who "said she had had enough of the harassing and inti[m]idat[ion] that was going on."[60]  After the council meeting that day, Duffy met with the City attorney, Cornwell, Kerley, and the Chief of Police "to plan how and when we would give Ron notice of the suspension with pay."[61]  Duffy testified that he had made the decision to suspend Stilwell with pay sometime during the afternoon of December 9.[62]

---

[58]Pruett Deposition at 171:17-172:17, Exhibit 10, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[59]Exhibit 13 at Byrnes000095, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[60]Id.

[61]Id.

[62]Duffy Deposition at 290:1-4, Exhibit 3, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

On December 10, 2010, Stilwell was placed on paid administrative leave pending an investigation into the allegations of misconduct.[63]  Stilwell avers that he was not told the nature of the alleged misconduct.[64]  While on administrative leave, Stilwell was "expected to make [himself] available between 8:00 a.m. and 5:00 p.m. Monday through Friday" and was "ask[ed]" to "relinquish all City vehicles and keys, property and equipment, except" for his "City-issued cell phone so that" the City could contact him.[65]

The City hired Erin Byrnes, a Phoenix attorney, to conduct the investigation of Stilwell.  Brynes completed her report on January 3, 2011.[66]  Byrnes once worked at the same firm as Kellie Peterson, the City attorney.[67]  Byrnes had one or two conversations with Duffy prior to coming to Williams to conduct her investigation during which Duffy told Brynes the following:  1) Stilwell had been arrested for domestic violence, 2) Pruett and Fuller had told Duffy that Stilwell had created a hostile work environment and allowed the ongoing sexual harassment of Fuller, 3) Stilwell had buried asbestos pipe, 4) Stilwell had

---

[63]Memorandum from Susan Kerley to Ron Stilwell at 1, Exhibit 5, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[64]Affidavit of Ronnie D. Stilwell at 1, ¶ 1, Exhibit 7, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[65]Memorandum from Susan Kerley to Ron Stilwell at 1, Exhibit 5, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[66]Exhibit 6, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[67]Deposition of Erin Byrnes, Esq., at 8:14-23, Exhibit 14, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

manipulated test results, 5) Stilwell was a former jock, who ran his department like a football coach, 6) Stilwell's performance vacillated between good and bad, 7) Stilwell was a master at protecting himself and being manipulative, 8) Stilwell had considered resigning, and 9) Stilwell was accused of falsifying Arizona Department of Environmental Quality (ADEQ) results.[68]

Brynes interviewed Pruett, Fuller, Dan Curtis, Mike Tissaw, Stilwell, and Randy Stilwell.[69]   Byrnes testified that she did not recall who made the list of persons to be interviewed and that she did not recall if Stilwell asked her to interview an additional 5-6 people.[70]

In the Executive Summary of her investigative report, Brynes wrote that she believed

> the Water Department to be rife with serious misconduct warranting immediate City attention.  Mr. Stillwell [sic] runs his Department by expressly and impliedly intimidating his employees.  He makes them believe that City administration wants to fire them, and that he is the only one who can save them.  This environment causes employees to be in a state of near constant fear for their jobs and leaves them completely

---

[68]Exhibit 15, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[69]Exhibit 16 at Stilwell 107, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[70]Byrnes Deposition at 97:11-98:24, Exhibit 14, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

>unwilling to respond to widespread wrongdoing within the Department.
>
>...Some of [the Water Department's male employees] directly sexually harassed Ms. Fuller by sexually proposition[ing] her, while others engaged in sexual talk about her. She became aware of this about the same time as she found completing all her regular duties, in addition to assigned janitorial duties, impossible.
>
>Some of the male employees, le[]d primarily by foreman Dan Curtis, became frustrated [that] Ms. Fuller was not doing all of her janitorial duties. This coincided with that group's development of a suspicion that Fuller and Mr. Pruett were having an affair. The group perpetuated this rumor, while simultaneously intentionally ostraciz[ing] Pruett and Fuller from the rest of the Department.
>
>As a separate matter, I also verified that Department employees have falsified tests submitted to the State at Mr. Stillwell's [sic] direction. They have also buried hazardous materials on City grounds, again at Stillwell's [sic] direction.
>
>... Based on the facts detailed below, I recommend that Mr. Stillwell [sic] be terminated <u>immediately</u> and the City consider taking the same action, or some lesser form of discipline, with regards to Mr. Curtis.[71]

In the "facts" section of her report, Brynes discussed the allegations about Stilwell's management style. She noted that "Pruett may have either exaggerated some in his accounting of events, either because of his ability to finally see this matter addressed, or

_____

[71]Exhibit 16 at Stilwell 108, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

because he is predisposed to view things as more serious having been subjected to maltreatment for a significant period of time[.]"[72]

As for the falsification of wet samples, Brynes stated that Pruett said "that within the past five years, Mr. Stillwell [sic] has required him to falsify the wet test samples that the Department submits to ADEQ" but that Stilwell said that "Pruett independently decided to falsify samples."[73]  Tissaw told Brynes that it was Pruett who told him to "cheat" on the testing, but that "[a]nything that Billy [Pruett] said, you could figure came from" Stillwell.[74] Based on this information and the fact that other employees told her that "Pruett is essentially incapable of making a decision independently, particularly a difficult or controversial one," and the fact that Fuller "provided information about concerns expressed by a lab the Department uses for other testing in Flagstaff regarding Mr. Stillwell's [sic] willingness to truthfully report test results to ADEQ", Brynes concluded that Stilwell "was behind the falsification of wet samples, even if he did not, himself, do the falsifying."[75]  Brynes also noted that Stilwell "<u>did</u> <u>not</u> indicate that he had taken any disciplinary action against Mr. Pruett, nor did he tell me of any remedial steps he had taken

---

[72]<u>Id.</u> at Stilwell 111.

[73]<u>Id.</u>

[74]<u>Id.</u> at 112.

[75]<u>Id.</u>

to ensure the samples would not be falsified in the future."[76]  At her deposition, Brynes acknowledged that Stilwell had shown her his notes and the photographs related to the November 27, 2010 incident at the Water Treatment Plant and that she could only speculate that she did not write in her report that she had seen this information "because [she] did not think that they were relevant to the scope of my investigation."[77]  Brynes also testified that her notes for her interview of Randy Stilwell indicate that he told her he saw Pruett "falsify testing with distilled water",[78] but  she did not include this information in her report.

As for the burying of the asbestos pipe, Pruett told Brynes that Curtis and Stilwell buried the pipe; Curtis told her that he and Pruett buried the pipe at Stilwell's direction; and Stilwell told her that Pruett and two other former employees buried the pipe "in direct contravention to his directive to double bag it, per regulations, and transport it to St. [Joseph's] ... for proper disposal."[79]  Brynes concluded that "[i]t appears that Dan Curtis and Bill Pruett were probably involved in burying the pipe and that it was done at Mr.

---

[76]Id.

[77]Brynes Deposition at 276:18-277:14, Exhibit 14, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[78]Id. at 330:1-4.

[79]Exhibit 16 at Stilwell 113, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

Stillwell's [sic] direction" but that "[r]egardless of who buried the pipe, it is clear it is still on City (or federal property), that Mr. Stillwell [sic] knows it, and yet took no action to rectify what may be a violation of both federal and state law."[80]  Curtis, however, avers that Stilwell gave him, Pruett, and two other employees a verbal reprimand, and told them "in a group setting that, if any of us were ever involved with anything like this again, we would get written up and that what we did was against the law.  Mr. Stilwell also told us in this group setting that he had informed Mr. Joseph Duffy about this unlawful burial but that Mr. Duffy did not want them to incur any further expense in removing the AC pipe and disposing of it properly."[81]

In the "fact" section of her report, Brynes also included Pruett's and Fuller's "belief" that Stilwell was using drugs and that all of the employees reported that he was "routinely not at the office between regular Department hours."[82]

On January 5, 2011, Stilwell was terminated.  Duffy, who was the interim City manager at the time, testified that the decision to terminate Stilwell was made by himself;

_____

[80]Id. at Stilwell 113-114.

[81]Curtis Declaration at 2, ¶ 4, Exhibit 8, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[82]Exhibit 16 at Stilwell 126, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

Peterson, Kerley, and Cornwell.[83]  Kerley, however, testified that Duffy alone made the decision to terminate Stilwell,[84] and Cornwell testified that he was not involved in the decision to terminate Stilwell.[85] Stilwell was given a termination letter signed by Cornwell. Cornwell testified that Duffy and Kerley gave him the letter to sign and asked him to sign it because if Stilwell appealed his termination, "the appeal would go to acting city manager Joe Duffy."[86]

The termination letter advised Stilwell that he was being terminated "based on the receipt of complaints from employees and the general public."[87] The letter explained that Stilwell was being terminated for "fail[ing] to properly supervise the work and activities of the Water and Wastewater Departments" because he had

1)      failed to address known problems of sexual harassment in the workplace;

2)      required employees to engage in the falsification of wet testing and/or failed to take corrective action when he became aware of said falsification;

---

[83]Deposition of Joseph Duffy at 11:6-11, Exhibit 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[84]Kerley Deposition at 224:16-18, Exhibit 4, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[85]Deposition of R. Glenn Cornwell at 9:24-10:7, Exhibit 3, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[86]Id. at 9:12-18.

[87]January 5, 2011 Termination Letter at 1, Exhibit 2, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

3)      required employees to improperly dispose of hazardous materials and/or

        failed to take corrective action when he became aware that employees had

        done so;

4)      manipulated equipment to avoid proper recording of water treatment

        volumes;

5)      used "threats and intimidation to manage employees thereby creating an

        environment wherein employees were fearful for their jobs and afraid to

        report any wrongdoing to anyone outside the Water Department[;]"

6)      consistently not been on site during work hours; and

7)      used his position as a City employee to threaten members of the public.[88]

The termination letter advised Stilwell that he could "appeal this decision by filing

a Notice of Appeal with the City Manager within ten business days of receipt of th[e]

letter."[89]  Attached to the letter was a copy of Sections 7.01 and 7.02 of the City's Employee

Manual, which dealt with "Disciplinary Action[s]" and "Appeal[s] of Disciplinary Actions"

respectively.

---

[88]Id. at 1-2.

[89]Id. at 1.

City Policy Section 7.01 provides that "[i]t shall be the policy of the City to administer discipline fairly, reasonably, and impartially."[90]  Policy Section 7.01 further provides that "[c]ity employees shall be evaluated on the basis of reasonable standards of job performance and professional conduct.  Failure or refusal to meet these standards shall constitute just cause for appropriate disciplinary action, up to and including termination of employment."[91]

Procedure Section 7.01 provides that "[c]lassified employees shall have the right to a review of the action by management personnel not involved in the suspension and/or termination actions imposed upon them."[92]

City Policy Section 7.02 provides that

> [a] process of appeal for disciplinary actions is provided employees.  Differing degrees of discipline are afforded differing degrees of appeal.  All appeals and reviews of disciplinary actions shall be conducted within the City of Williams according to these regulations and applicable State and Federal Statutes.[[93]]

---

[90]Policy Section 7.01(A), Exhibit 2 at Stilwell 449, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[91]Id. at Section 7.01(B).

[92]Procedure Section 7.01(B), Exhibit 2 at Stilwell 450, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[93]Policy Section 7.02(A), Exhibit 2 at Stilwell 449, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

Procedure Section 7.02 provides that a permanent classified employee may appeal a termination "through the appeal process to the City Manager ... by filing a Notice of Appeal[.]"[94]  Unclassified employees are "excluded from th[is] appeal process[.]"[95]  The Notice of Appeal "must be submitted in writing ... within ten (10) business days of the employee's receipt of a notice of termination[.]"[96]  The Notice of Appeal must be "hand delivered or served upon the City Manager or designee."[97]  The "appeal process shall not be deemed an administrative action governed by the Arizona Administrative Review Act[.]"[98]  The Notice of Appeal must "[a]ffirmatively request either a decision based upon the written materials only or a personal meeting with the City Manager or designee...."[99]

Procedure Section 7.02 further provides that "[o]nly after completion of the appeal process through the City Manager may the employee seek a complete review of the City Manager's decision through an[] administrative appeal before an Administrative Hearing

---

[94]Procedure Section 7.02(C)(1), Exhibit 2 at Stilwell 451, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[95]Id. at Section 7.02(F).

[96]Id. at Section 7.02(G).

[97]Id. at Section 7.02(H), Exhibit 2 at Stilwell 452.

[98]Id. at Section 7.02(G), Exhibit 2 at Stilwell 451-452.

[99]Id. at Section 7.02(H)(3), Exhibit 2 at Stilwell 452.

Officer conducted in accordance with Arizona Rules of Administrative Procedure."[100]   A

request for an administrative appeal before an Administrative Hearing Officer "must be

in writing and filed with the Clerk of the City of Williams...."[101]   If an employee does not

request an administrative appeal within fourteen (14) days of the City Manager's decision,

"[t]he action of the City will be considered final and conclusive."[102]

On January 13, 2011, Stilwell hand delivered a Notice of Appeal.[103]   In the Notice of

Appeal, Stilwell disputed each of the allegations made in the termination letter.   Stilwell

contended that he had

      1)      expressed concern about sexual harassment to Kerley and informed

                 Cornwell and Duffy about the problem[104];

---

[100]Id. at Section 7.02(M), Exhibit 2 at Stilwell 453.

[101]Id. at Section 7.02(N).

[102]Id. at Section 7.02(O).

[103]Notice of Appeal, Exhibit 14, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[104]Stilwell avers that by August 2010, he suspected that Pruett and Fuller were having an affair and that he believed "this conduct ... constituted unlawful sexual harassment[.]"   Third  Stilwell Affidavit at 9, ¶ 15, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.  On August 23, 2010, Stilwell emailed Kerley about the situation and asked to meet with her to discuss it. Exhibit 26 to Third Stilwell Affidavit, Exhibit 1, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

2)    gave Pruett a verbal warning when he became aware that Pruett was

falsifying wet samples and was in the process of writing Pruett up when he

was put on administrative leave;

3)    been on vacation when the hazardous materials were disposed of and Pruett

advised him that they had been disposed of properly;

4)    not manipulated equipment to avoid proper recording of water treatment

volumes because only an electrician can change the recording equipment;

5)    not used threats and intimidation to manage employees during the 19 years

he was the Water Superintendent;

6)    worked the night shift if there were treatment problems and sent emails to

Duffy, Cornwell, and Kerley advising that he was doing so until Duffy

instructed him not to send emails at night;  and

7)    not used his position as a City employee to threaten members of the

public but rather, with Cornwell's knowledge, went to Bearizona after

one of their employees made a rude gesture.[105]

---

[105]Notice of Appeal at Stilwell 457-458, Exhibit 14, Plaintiffs' Motion for Partial
Summary Judgment, Docket No. 133.

On January 24, 2011, Duffy sent Stilwell a letter "to acknowledge the timely receipt of your request for [an] appeal of your termination."[106]  Duffy asked Stilwell to "please specify pursuant to Procedure 7.02 whether you would like a decision based upon the written materials only, or a personal meeting with the City Manager or designee."[107]  Duffy also denied Stilwell's request for a copy of Byrnes' investigative report because "[t]he basis for discipline is not the report itself, but the underlying testimony of the witnesses as summarized in the notice of termination" and because "[t]he report is a confidential document subject to Attorney-Client privilege[.]"[108]  Duffy testified that this was the first appeal he had ever handled as City Manager.[109]  On February 8, 2011, Stilwell advised Duffy that he would like his appeal to be "based upon written material as per procedure 7.02."[110]

---

[106]Letter from Joe R. Duffy to Ron Stilwell, Exhibit 15 at Stilwell 460, Plaintiffs' Motion for Summary Judgment, Docket No. 133.

[107]Id.

[108]Id.

[109]Duffy Deposition at 118:19-22, Exhibit 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[110]Letter from Stilwell to Duffy, Exhibit 16, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

On February 25, 2011, Duffy issued a written determination of Stilwell's appeal "[p]ursuant to City Personnel Policy Section 7.02...."[111]  Duffy "concluded that it [was] appropriate to uphold [Stilwell's] supervisor's recommendation for termination."[112] Duffy explained that Stilwell had "not provided any evidence in support of your allegations in your letter of appeal, such as emails, specific dates, or witness statements.  Further, the allegations in the appeal letter are in direct contradiction to your statements given to the investigator."[113]  One of the examples of inconsistencies was that in his appeal letter, Stilwell contended that he had contacted Kerley and Cornwell regarding his concerns about sexual harassment, but Duffy claimed that he had checked with Kerley and Cornwell, both of whom said that Stilwell had not made any reports concerning sexual harassment.[114]  However, at his deposition, Duffy testified that Kerley had in fact told him that Stilwell had talked to her about sexual harassment.[115]  In the written determination, Duffy advised Stilwell that he could "appeal this action by filing a request for a full hearing before an administrative hearing officer within fourteen calendar days of receiving this

---

[111]Exhibit 17, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133 (emphasis added).

[112]Id. at Stilwell 463.

[113]Id.

[114]Id. at Stilwell 463-64.

[115]Duffy Deposition at 131:15-20, Exhibit 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

letter, pursuant to City Personnel Policy Section 7.02."[116]  Although the written determina-

tion was signed by Duffy, he testified that he believed that the determination had been

drafted by the City attorney and Kerley.[117]

Stilwell avers that he received the written determination on March 9, 2011.[118]  On

March 14, 2011, Stilwell sent a certified letter to the City of Williams, to Duffy's attention,

in which Stilwell "request[ed] an administrative hearing regarding [his] termination."[119]

On April 12, 2011, Duffy denied Stilwell's request for an administrative hearing for

failure to comply with City Personnel Policy Section 7.02(N).[120]  Duffy explained to Stilwell

that "[b]ecause you did not file your appeal with the Clerk of the City of Williams within

fourteen calendar days after you received my determination regarding your appeal on the

written record, under City Personal Policy Section 7.02(O), the action of the City will be

considered  final  and  conclusive,  and  the  City  will  not  process  your  request  for  a

_____

[116]Exhibit 17 at Stilwell 464, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[117]Duffy Deposition at 129:7-19, Exhibit 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[118]Stilwell Affidavit at 2, ¶ 3, Exhibit 7, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[119]Letter from Ron Stilwell to Joe Duffy, Interim City Manager, Exhibit 18, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[120]Letter from Joe Duffy, Interim City Manager, to Ron Stilwell, Exhibit 19, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

hearing."[121]  Duffy testified that he did not draft the April 12 letter and that the decision to deny Stilwell's request for an administrative hearing was made as a result of discussions between himself, Kerley and the City attorney.[122]  Kerley, however, testified that Duffy did not consult with her prior to making the decision to deny Stilwell's request for an administrative hearing.[123]

On April 21, 2011, Fuller and Pruett, using their City email, sent an email to the ADEQ , which read, in pertinent part:

> [a]n unknown quantity of barrels/drums containing possible paint/solvent were buried behind the Water Treatment Plant vehicle bay area; away from the treatment plant, in a designated non-residential area.  Also buried nearby are approx. 10-20 pieces of 20' x 4' cement asbestos pipe.  This was done in the past under the direction of the previous person(s) in charge.  This site is on USFS property.  We have met with them.  Per their specifications, we are hiring Western Technologies in Flagstaff to assist us in removing and disposing of this material.[[124]]

---

[121]Id.

[122]Duffy Deposition at 134:4-135:5, Exhibit 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[123]Kerley Deposition at 237:7-10, Exhibit 4, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

[124]Exhibit 23, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

On August 1, 2011, Duffy wrote to the ADEQ "to report suspected violations of ADEQ licensing regulations and to request an investigation into the matter."[125]  Duffy advised the ADEQ that "[i]n the course of conducting an internal investigation into other matters, [the City] received information indicating that testing protocols may have been violated, tests may have been falsified, and hazardous material was improperly disposed of."[126]  Duffy further advised that "[t]he party we believe to be responsible for this action, Mr. Ron Stillwell [sic], holds a TYPE OF CERTIFICATION from ADEQ."[127]  Duffy attached to the letter a July 21, 2011 letter from David Monihan, Jr., of Shephard Wesnitzer, Inc., whom the City had hired "to support the current operators as they took up the duties that were previously performed by Mr. Stilwell."[128]  Monihan listed five particular areas in which he believed that Stilwell failed to "perform[] to the standard of care required of a Certified Operator[,]" including submitting "falsified [SMR] reports to the regulatory agency."[129]  At his deposition, Monihan acknowledged that laboratory forms which contain the information needed to prepare an SMR report were filled out by Pruett, Fuller, Tissaw,

---

[125]Exhibit 20 at DFT 2647, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[126]Id.

[127]Id.

[128]Exhibit 21, at DFT 641, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[129]Id. at DFT 641-642.

and other employees, but not Stilwell.[130]   Also attached to Duffy's letter was a letter from

Western Technologies, Inc., which had been hired to dispose of the buried asbestos pipe.[131]

Approximately one year after he was terminated, Stilwell was hired as a lead water

operator by CH2M Hill, which "operate[s] the City of Prescott Valley's water/wastewater

distribution systems."[132]   On April 19, 2012, Juan Mancha, Shane Shatzer, and Jim Kendall,

all of whom work for CH2M Hill, were at the Prescott Valley Primary and Urgent Care

Center.  Mancha avers that a woman he later identified as Fuller, came up to him and said,

"so you work with Ron (Stilwell), you'll regret that."[133]   Shatzer and Kendall aver that this

woman, whom they also later identified as Fuller, told them that "we would regret that we

hired" Stilwell and that "you better watch him because he will stab you in the back."[134]

---

[130]Deposition of David Monihan at 133-34, Exhibit 24, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[131]Exhibit 22, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

[132]Stilwell Deposition at 197:15-18, Exhibit M, Defendants' Motion for Summary Judgment re Employment Claims, Docket No. 145.

[133]Affidavit of Juan Mancha at 2, ¶ 4, Exhibit 25, Plaintiffs' Response to Defendants' Motion[s] for  Partial Summary Judgment, Docket No. 152.

[134]Affidavit of Shane Shatzer at 2, ¶ 3; Affidavit of Jim Kendall at 2, ¶ 3; Exhibit 25, Plaintiffs' Response to Defendants' Motion[s] for  Partial Summary Judgment, Docket No. 152.

Fuller denied that she was at the Prescott Valley Primary and Urgent Care Center that day.[135]

Plaintiffs commenced this action on January 3, 2012.  In their amended complaint, plaintiffs asserted the following claims: 1) an ADEA retaliation claim against the City, Duffy, and Cornwell; 2) an equal protection § 1983 claim against all defendants; 3) a First Amendment § 1983 retaliation claim against all defendants; 4) a 14th Amendment due process § 1983 claim against all defendants; 5) a common law wrongful discharge claim against the City, Duffy, and Cornwell; 6) a wrongful discharge claim under A.R.S. § 23-1501(3)(d) against the City, Duffy, and Cornwell; 7) a breach of contract claim against the City; 8) a breach of the implied covenant of good faith and fair dealing claim against the City; 9) an intentional interference with contract claim against Duffy and Cornwell; 10) an intentional infliction of emotional distress claim against all defendants; 11) a negligent infliction of emotional distress claim against all defendants; 12) a slander and/or libel claim against the City and Duffy; 13) a slander and/or libel claim against the City, Duffy, and Cornwell based on alleged statements made to Stilwell's prospective employers; 14) a slander claim against Fuller; 15) a libel claim against all defendants; and 16) a false light

_____

[135]Deposition of Kathy Fuller at 122:6-11, Exhibit 11, Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment, Docket No. 152.

invasion of privacy claim against all defendants.  Plaintiffs have since withdrawn their second, twelfth, and thirteen claims for relief.[136]

Plaintiffs now move for summary judgment on their due process § 1983 claim, their A.R.S. § 23-1501(3)(d) wrongful discharge claim, their breach of the implied covenant of good faith and fair dealing claim, and their intentional interference claim against Duffy. Defendants cross-move for summary judgment on all of plaintiffs' remaining claims.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor.  <u>Id.</u> at 255.  "Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered."  <u>Las Vegas Sands, LLC v. Nehme</u>, 632 F.3d 526, 532 (9th Cir. 2011).

---

[136]Plaintiffs' Response to Defendants' Motion[s] for Partial Summary Judgment at 36 & 56, Docket No. 152.

<u>First Claim for Relief:  ADEA retaliation</u>

Plaintiffs allege that the "City, Duffy, and Cornwell retaliated against Stilwell for opposing age discrimination in violation of 29 U.S.C. § 623(d)...."[137]  Section 623(d) of the Age Discrimination in Employment Act (ADEA) "makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding under the ADEA."  <u>O'Day v. McDonnell Douglas Helicopter Co.</u>, 79 F.3d 756, 763 (9th Cir. 1996).  "To make out a claim of retaliation, an employee must establish three things:  first, that he engaged in statutorily protected activity; second, that he was discharged or suffered some other adverse employment decision; and third, that there is a causal connection between the two."  <u>Id.</u>

Stilwell contends that the protected activity was his involvement with the <u>Smith</u> case.  Although defendants dispute that being named in a witness disclosure statement rises to the level of protected activity, they are willing to assume that for purposes of the instant motions, Stilwell engaged in protected activity.[138]

As for the second element, in the Ninth Circuit, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."  <u>Ray v. Henderson</u>, 217 F.3d 1234, 1243 (9th Cir. 2000).  Adverse

---

[137]First Amended Complaint at 13, ¶ 48, Docket No. 18.

[138]Defendants' Motion for Partial Summary Judgment re: Employment Claims at 6, Docket No. 145.

employment actions include "lateral transfers, unfavorable job references, and changes in work schedules."  Id.

Plaintiffs contend that they have presented evidence that negative comments were made about Stilwell, that changes in workplace policy were made, and that Stilwell was no longer given management support.  They argue that this pattern of behavior by Duffy went on for over 15 months and thus they contend that Duffy that created a hostile work environment for Stilwell.

The evidence that plaintiffs have presented of an on-going hostile work environment is largely nothing more than Stilwell being snubbed and ostracized by Duffy.  But "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action."  Brooks, 229 F.3d at 778.  The only actions to which Stilwell was subjected that could be considered adverse employment actions were Stilwell's suspension and termination.

As to those adverse employment actions, Stilwell has failed to show that there are genuine issues of material fact as to a causal connection between these actions and his involvement in the Smith case.  "To establish causation [Stilwell] must show 'by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [his] firing [or suspension] and that but for such activity [he] would not have been fired'" or suspended.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th

Cir. 2002) (quoting <u>Ruggles v. Calif. Polytechnic State Univ.</u>, 797 F.2d 782, 785 (9th Cir. 1986)).  "[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."  <u>Id.</u> at 1065.  "But timing alone will not show causation in all cases; rather, 'in order to support an inference of retaliatory motive, the termination must have occurred 'fairly soon after the employee's protected expression.'"  <u>Id.</u> (quoting <u>Paluck v. Gooding Rubber Co.</u>, 221 F.3d 1003, 1009-10 (7th Cir. 2000)).

Causation cannot be inferred here based on temporal proximity because Stilwell's termination and suspension occurred too long after he first indicated a willingness to testify in the <u>Smith</u> case.  Stilwell was suspended and terminated almost one year after he was disclosed as a witness in the <u>Smith</u> case.  The Ninth Circuit has held that one year is too long.  <u>Coons v. Sec. of U.S. Dep't of Treasury</u>, 383 F.3d 879, 887 (9th Cir. 2004).

Plaintiffs have also failed to come forward with any other evidence that suggests that Stilwell was suspended and terminated because of his involvement in the <u>Smith</u> case. Plaintiffs insist that the suspension and termination were the final acts of Duffy's 15-month harassment of Stilwell because of his involvement in the <u>Smith</u> case.  But no reasonable jury could so find.  Stilwell complained of trivial conduct such as Duffy not saying good morning or walking out of the room when Stilwell entered.  No reasonable jury could conclude that after months of such trivial ill-treatment, Duffy suddenly decided to launch

-36-

an investigation that would lead to Stilwell's termination, all because Stilwell might be a witness in the <u>Smith</u> case.  There is simply no nexus between Stilwell's suspension and termination and his involvement in the <u>Smith</u> case.  Thus, plaintiffs cannot make out a <u>prima facie</u> case of ADEA retaliation, and the City is entitled to summary judgment on this claim.

Plaintiffs have also asserted an ADEA retaliation claim against Duffy and Cornwell. Duffy and Cornwell are sued in their official and individual capacities.[139]  Duffy and Cornwell are entitled to summary judgment on plaintiffs' ADEA claim against them in their official capacities because those claims merge with the claim against the City.  <u>Oshilaja v. Watterson</u>, Case No. CV 05–3429–PHX–RCB, 2007 WL 2903029, at *7 (D. Ariz. Sept. 27, 2007).  Duffy and Cornwell are also entitled to summary judgment on plaintiffs' ADEA claim against them in their individual capacities because there is no individual liability under the ADEA.  <u>Miller v. Maxwell's Int'l, Inc.</u>, 991 F.2d 583, 587 (9th Cir. 1993).

<u>Third Claim for Relief:  First Amendment § 1983 claim</u>

In their amended complaint, plaintiffs allege that

> Stilwell's right to oppose age discrimination and not to be retaliated against in any regard for such opposition or to be discharged from public employment for doing so is protected by the First Amendment of the United States Constitution.

_____

[139]First Amended Complaint at 2, ¶ 8, Docket No. 18.

> Stilwell's opposition to age discrimination involving Carolyn
> Smith involves a matter of public concern.[140]

Based on these allegations, plaintiffs assert a First Amendment § 1983 retaliation claim

against all defendants.

This claim fails because the Ninth Circuit has held that "the ADEA precludes the

assertion of age discrimination in employment claims, even those seeking to vindicate

constitutional rights, under § 1983." <u>Ahlmeyer v. Nevada System of Higher Educ.</u>, 555 F.3d

1051, 1057 (9th Cir. 2009).  In other words, "a § 1983 claim based on age discrimination is

prohibited, because Congress intended the ADEA to provide the exclusive means of

pursuing federal claims of age discrimination in employment." <u>Cozzi v. County of Marin</u>,

787 F. Supp. 2d 1047, 1074 (N.D. Cal. 2011).  This prohibition extends to First Amendment

claims that are based on an employee's allegations that he was retaliated against for

complaining about age discrimination. <u>Id.</u>; <u>see</u> <u>also</u>, <u>Phillis v. Harrisburg School Dist.</u>, Case

No. 1:07–cv–1728, 2010 WL 1390663, at *10 (M.D. Pa. Mar. 31, 2010) (holding that the

plaintiff's "First Amendment retaliation claims are precluded by the ADEA").

Plaintiffs' argument that <u>Ahlmeyer</u> does not apply to ADEA retaliation claims is

unavailing.  While it is true that <u>Ahlmeyer</u> involved a direct age discrimination claim, as

opposed to a claim of retaliation, the Ninth Circuit held that the ADEA is the exclusive

remedy for age discrimination claims without making any distinction between direct

---

[140]First Amended Complaint at 13-14, ¶ 52, Docket No. 18.

discrimination claims and retaliation claims.  Defendants are entitled to summary judgment on plaintiffs' First Amendment § 1983 claim.

Fourth Clam for Relief:  14th Amendment § 1983 claim

In their fourth claim for relief, plaintiffs allege that Stilwell's termination deprived him of his property interest in his job and his liberty interest in his good name without due process of law.[141]  Plaintiffs contend that Stilwell was entitled to both a pre-termination hearing and a post-termination hearing.

"The Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'"  Blantz v. Calif. Dep't of Corrections and Rehabilitation, Div. of Correctional Health Care Srvcs., 727 F.3d 917, 922 (9th Cir. 2013) (quoting U.S. Const. amend. XIV, § 1).  "'[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality.'" Tibbetts v. Kulongoski, 567 F.3d 529, 535 (9th Cir. 2009) (quoting Brady v. Gebbie, 859 F.2d 1543, 1552 (9th Cir. 1988)).  "In order to trigger the procedural protections of due process attendant to a properly presented liberty interest claim, a plaintiff must show that '1) the accuracy of the charge is contested; 2) there is some public disclosure of the charge; and 3) the charge is made in connection with termination of employment.'"  Brady, 859 F.2d at

---

[141]First Amended Complaint at 14, ¶ 55, Docket No. 18.

1552 (quoting Matthews v. Harney County, Or., School Dist. No. 4, 819 F.2d 889, 891-92 (9th

Cir. 1987)).

> A "public employer can violate an employee's rights by
> terminating the employee if in so doing, the employer makes
> a charge that might seriously damage [the terminated em-
> ployee's] standing and associations in his community or
> impose[s] on [a terminated employee] a stigma or other
> disability that foreclose[s] his freedom to take advantage of
> other opportunities."

Blantz, 727 F.3d at 925 (quoting Tibbetts, 567 F.3d at 536) (emphasis added).

The grounds stated for Stilwell's termination have not seriously or substantially

damaged his reputation to the point of permanently precluding him from obtaining

employment opportunities, as evidenced by the fact that he found employment with

CH2M Hill in the same field that he occupied while employed by the City.  However, an

employee's liberty interests can also be implicated if the employer makes a charge that

might seriously damage the employee's reputation in the community.  Id.  The charges

made against Stilwell involved both dishonesty and immorality, which are charges that

might seriously damage his standing in the community.  But in order for Stilwell's liberty

interest to be implicated, those charges also had to be published.

Plaintiffs contend that defendants published the allegations that Stilwell unlawfully

condoned the burial of the asbestos pipe and the false wet testing in the letter that Duffy

sent to the ADEQ on August 1, 2011 and in the April 2011 email Pruett and Fuller sent to

-40-

the ADEQ.  Plaintiffs emphasize that the August 2011 letter, which mentioned Stilwell by name, was sent to the ADEQ for the purpose of having the ADEQ, the state licensing agency, investigate Stilwell and cancel his license.

The problem with plaintiffs' argument, however, is that "'there must be some temporal nexus between the employer's statements and the termination.'"  Tibbetts, 567 F.3d at 537 (quoting Campanelli v. Bockrath, 100 F.3d 1476, 1483 (9th Cir. 1996)).  Statements made too long after the termination are not made in the course of the termination.  Id.  Statements published 16 months after an employee's termination are too remote, id., as are statements published five months after termination.  Martz v. Incorporated Village of Valley Stream, 22 F.3d 26, 32 (2d Cir. 1994).  Here, the statements made in the April 2011 email were made four months after Stilwell's termination and the statements made in the August 2011 letter were made eight months after Stilwell's termination.  All of these statements were made too long after Stilwell's termination to have been made in the course of his termination.  Thus, Stilwell's liberty interest has not been implicated.

Plaintiffs also argue that Stilwell had a protected property interest. "[G]overnment employees can have a protected property interest in their continued employment ... if the terms of the employment make it clear that the employee can be fired only for cause."  Blantz, 727 F.3d at 922.

City Ordinance No. 850 provides that City employees can be terminated "at any time for any reason not unlawful, with or without cause or notice."[142]   In addition, Regulation 1.04(A) in the City's Employee Manual provides that "[a]ll City employees regardless of type, are employees 'at-will', consistent with the public policy of the State of Arizona and as defined in Ariz. Rev. Stat. Ann. § 23-1501, et seq."[143]  And, Section 1.01(B) of the City's Employee Manual provides that City employees are "at will" employees, who can be terminated without cause.[144]

Although these provisions plainly indicate that Stilwell was an "at will" employee who could be terminated without cause, plaintiffs argue that Stilwell could only be terminated for cause.   Plaintiffs contend that Stilwell had an implied contract that turned his at-will employment into employment terminable for cause. "In Arizona, implied-in-fact terms may be found in an employer's policy statements regarding job security or employee disciplinary procedures, such as those contained in personnel manuals or memoranda." Roberson v. Wal-Mart Stores, Inc., 44 P.3d 164, 169 (Ariz. Ct. App. 2002).  "Whether there is a promise of job security or certain disciplinary procedures implied-in-fact by an

---

[142]Section 9.03(a), City of Williams Ordinance No. 850, Exhibit N, Defendants' Motion for Partial Summary Judgment re: Employment Claims, Docket No. 145.

[143]Exhibit P, Defendants' Motion for Partial Summary Judgment re: Employment Claims, Docket No. 145.

[144]City of Williams Employee Manuel [sic], Section 1.01(B), Exhibit 8 at Stilwell 140, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

employer through its personnel manual or otherwise is a question of fact." Id. "Not all employer policy statements, however, create contractual promises." Id. "'A statement is contractual only if it discloses a promissory intent or [is] one that the employee could reasonably conclude constituted a commitment by the employer.'" Id. (quoting Demasse v. ITT Corp., 984 P.2d 1138, 1143 (Ariz. 1999)).  "'An implied-in-fact contract term is formed when a reasonable person could conclude that both parties intended that the employer's (or the employee's) right to terminate the employment relationship at-will had been limited.'" Id. (quoting Demasse, 984 P.2d at 1143).

Plaintiffs argue that Stilwell had an implied contract the terms of which were that he only could be terminated for cause because Policy Section 7.02 provides that he is entitled to the disciplinary procedures set forth in Procedure Section 7.02.  Plaintiffs also argue that it is significant that the City confirmed in Stilwell's termination letter that he had a right to a post-termination hearing.  Plaintiffs also argue that the discipline that Stilwell received in 2009 reflected an understanding that Stilwell was entitled to a hearing and an appeal when it came to disciplinary matters.  In short, plaintiffs insist that Stilwell's at-will status was modified by the Employee Manual and the parties' mutual understanding that he was entitled to the disciplinary procedures that applied to employees who could only be terminated for cause.

-43-

Stilwell's at-will status was not altered by the Employee's Manual inclusion of review procedures.  Section 9.03(a) of Ordinance No. 850 provides that "[n]o statements written or oral made at any time to an employee or prospective employee including statements that discharge will only occur 'for cause' shall alter the at-will nature of the employment relationship."[145]  In addition, Section 9.03(b) of the Ordinance states that "[t]his Article 9 taken alone or in combination with any other ordinance, rule or regulation of the City of Williams shall not create an express or implied contract concerning any terms or conditions of employment."[146]  These provisions in Ordinance No. 850 make clear that the at-will status of an employee cannot be changed by promises made in the Employee Manual or a letter or by conduct.  Although the City's Employee Manual does not expressly state that it is not intended to be an employment contract, it does state that City employees were "at will" employees and that "[t]he employment relationship may not be changed from the 'at will' status by any document or statement, or by any employee of the City, unless such a change is specifically approved and adopted in writing by [the] City Counsel."[147]  This language, coupled with Ordinance No. 850, defeats plaintiffs' argument

---

[145]Exhibit N, Defendants' Motion for Partial Summary Judgment re: Employment Claims, Docket No. 145.

[146]Id.

[147]City Employee Manuel [sic], Regulation 1.01(B), Exhibit 8, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

that Stilwell's at-will status was altered.[148]  And although Stilwell was never given a copy of Ordinance No. 850, Ordinance No. 850 has been included in the City Code since January 2006, and thus it is binding on Stilwell regardless of whether he was given a copy or not.

The fact that Stilwell was told he had a right to appeal his termination does not mean that Stilwell's constitutional rights were violated.  In <u>Phillips v. Flowing Wells Unified School District No. 8 of Pima County</u>, 669 P.2d 969, 970 (Ariz. Ct. App. 1983), the question before the court was whether Phillips' employment contract required that she could only be terminated for cause.  Phillips "argue[d], if cause w[ere] not required, why was she given a lengthy public hearing to contest her termination."  <u>Id.</u> at 971.  The court stated that "[t]he short, simple answer to that argument is because board policy, as contained in an exhibit, provided that a hearing could be 'voluntarily granted' even though not required by law or board policy."  <u>Id.</u>  Similarly here, the City gave Stilwell a post-termination hearing because its procedures may have required it,[149] but that it does not mean that Stilwell could only be terminated for cause.

―――――――――――――――

[148]Plaintiffs' reliance on Smith's declaration as to the City's intent in enacting Ordinance No. 850 or as to the intent of the Employee Manual is misplaced because these documents are clear on their face.

[149]Section 7 of the City's Employee Manual set forth an appeals process for classified employees.  Although Stilwell was not a classified employee at the time of his termination, Williams City Code Article 2.2.12 continued to provide that "for purposes of personnel actions, the Water Superintendent shall be a 'classified employee.'"  Exhibit 9, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 133.

Stilwell was an at-will employee, and he did not have an implied-in-fact contract that altered this status.  Stilwell could be terminated without cause and thus he did not have a protected property right in his continued employment.

Because Stilwell's liberty interests were not implicated and he had no protected property right in his continued employment, plaintiffs are not entitled to summary judgment on their due process § 1983 claim.  Rather, defendants are entitled to summary judgment on this claim.

### Fifth Claim for Relief:  common law wrongful discharge

Plaintiffs allege that Stilwell was discharged "in violation of public policy established by common law in Wagenseller v. Scottdale Memorial Hospital, 147 Ariz. 370, 710 P.2d 1025 (1985)."[150]  In Wagenseller, the Arizona Supreme Court "first approved a tort cause of action for wrongful termination in violation of public policy."  Cronin v. Sheldon, 991 P.2d 231, 236 (Ariz. 1999).

Plaintiffs argue that the public policy at issue here involved the protection of free speech and the right to oppose age discrimination and that these policies are established by statute and the Arizona and Federal Constitutions.  Plaintiffs further argue that, as discussed in detail above, Stilwell was terminated in violation of these public policies.

---

[150]First Amended Complaint at 15, ¶ 57, Docket No. 18.

First of all, there is no common law claim for wrongful discharge in violation of public policy arising from federal law.  "In 1996, the Arizona Legislature enacted the AEPA in response to <u>Wagenseller</u>", which "spells out the public policy of this state."  <u>Galati v. Amer. West Airlines, Inc.</u>, 69 P.3d 1011, 1013 (Ariz. Ct. App. 2003).  In doing so, the Arizona legislature evinced an intent that the term "public policy" "contemplate[s] only transgressions of Arizona law as violative of Arizona public policy."  <u>Id.</u> at 1014.

As for any violation of Arizona public policy, Article 2, Section 6 of the Arizona Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."  Plaintiffs have alleged that Stilwell was terminated for speaking out about age discrimination, which could violate his right to free speech under the Arizona Constitution. But, there must be some nexus between his speaking out and his termination, which, as discussed above in connection with plaintiffs' ADEA retaliation claim, there is not.  Thus, the City, Duffy, and Cornwell are entitled to summary judgment on plaintiffs' common law wrongful discharge claim.

<u>Sixth Claim for Relief:  A.R.S. § 23-1501(3)(D) wrongful discharge</u>

Plaintiffs allege that Stilwell's termination violated A.R.S. § 23-1501(3)(D), which provides:

> An employee has a claim against an employer for termination of employment only ... [i]n the case of a public employee, if the employee has a right to continued employment under the United States Constitution, the Arizona Constitution, Arizona

> Revised Statutes, any applicable regulation, policy, practice, or contract of the state, any subdivision of the state or other public entity, or any ordinance of any political subdivision of the state.

A.R.S. § 23-1501(3)(D) (2011).   Plaintiffs argue that Stilwell had a right in his continued employment that was protected by the United States Constitution, the Arizona Constitution, and the City of Williams' policies and procedures.

This claim fails because Section 1501(3)(D) of the Arizona Employment Protection Act no longer exists.  "On September 29, 2012, the Arizona Legislature amended § 23–1501 to eliminate § 23–1501(3)(D)."   <u>Price v. Town of Dewey-Humboldt</u>, Case No. CV–12–8086–PCT–FJM, 2012 WL 5193434, at *2 (D. Ariz. Oct. 19, 2012).  "Therefore," plaintiffs' "cause of action under § 23–1501(3)(D) is no longer viable."  <u>Id.</u>

Plaintiffs' argument that Section 23-1501(3)(D) still applies because Stilwell's right to due process "vested" prior to the statute's abrogation is unavailing.  "A 'vested right is one which is absolute, complete, and unconditional to the exercise of which no obstacle exists, and which is immediate and perfect in itself not dependent upon a contingency.'"  <u>Brown Wholesale Elec. Co. v. H.S. Lastar Co.</u>, 730 P.2d 267, 272 (Ariz. Ct. App. 1986) (quoting <u>State v. Estes Corp.</u>, 558 P.2d 714, 716 (Ariz. Ct. App. 1976)).  But, "[a] cause of action depending solely on statute is not a vested right protected by the Constitution."  <u>Id.</u> Plaintiffs' sixth claim for relief is based entirely on A.R.S. § 23-1501(3)(D) and thus it did not

vest prior to the statute being abrogated.  The City, Duffy, and Cornwell are entitled to summary judgment on this claim.

<u>Seventh Claim for Relief:  breach of contract</u>

Plaintiffs allege that Stilwell had an implied contract, the terms of which required that he could only be terminated for cause after a formal hearing, and that this implied contract was breached by the City because he was not given a formal hearing nor was he provided an opportunity to appeal his termination administratively.[151]  This claim fails for the same reason plaintiffs' due process § 1983 claim fails.  Stilwell did not have an implied contract that provided he could only be terminated for cause.  The City is entitled to summary judgment on this claim.

<u>Eighth Claim for Relief:  breach of the implied covenant of good faith</u>

Plaintiffs allege that the City breached the implied covenant of good faith and fair dealing by terminating Stilwell without due process.[152]  "[E]very contract, including employment contracts, contains an implied-in-law covenant of good faith and fair dealing that requires 'neither party do anything that will injure the right of the other to receive the benefits of their agreement.'"  <u>Nelson v. Phoenix Resort Corp.</u>, 888 P.2d 1375, 1384 (Ariz. Ct. App. 1994) (quoting <u>Wagenseller</u>, 710 P.2d at 1038).  But, the covenant of good faith and

---

[151]First Amended Complaint at 15, ¶ 60, Docket No. 18.

[152]<u>Id.</u> at 16, ¶ 61.

fair dealing "'does not create a duty for the employer to terminate the employee only for good cause,'" nor does it "'protect the employee from a "no-cause" termination.'" <u>Consumers Int'l, Inc. v. Sysco Corp.</u>, 951 P.2d 897, 902 (Ariz. Ct. App. 1997) (quoting <u>Wagenseller</u>, 710 P.2d at 1038).

Plaintiffs' breach of the implied covenant claim fails because there was no contract that required the City to only terminate Stilwell for cause and the covenant cannot be used to create such a duty. The City is entitled to summary judgment on this claim.

<u>Ninth Claim for Relief:  intentional interference with contract</u>

Plaintiffs allege that Duffy and Cornwell interfered with Stilwell's employment contract resulting in Stilwell being terminated.[153]  In order to prevail on a claim for intentional interference with contractual relations, a plaintiff must prove:

> (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly.

<u>Safeway Ins. Co. v. Guerrero</u>, 106 P.3d 1020, 1025 (Ariz. 2005) (citation omitted).

Plaintiffs' intentional interference with contract claim fails because, as discussed above, Stilwell did not have an employment contract with the City. Duffy and Cornwell are entitled to summary judgment on this claim.

---

[153]First Amended Complaint at 16, ¶ 62, Docket No. 18.

Tenth Claim for Relief:  Intentional infliction of emotional distress

In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove that  (1) the defendant committed extreme and outrageous conduct; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress will result from the conduct; and (3) the conduct caused severe emotional distress.  Ford v. Revlon, Inc., 734 P.2d 580, 585 (Ariz. 1987).

As for the first element, "'[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Joseph v. Markovitz, 551 P.2d 571, 575 (Ariz. Ct. App. 1976) (quoting Restatement (Second) of Torts, § 46, comment d).   "'It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery....'"  Watts v. Golden Age Nursing Home, 619 P.2d 1032, 1035 (Ariz. 1980) (quoting Restatement (Second) of Torts § 46, Comment h).  "'[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'"  Mintz v. Bell Atlantic Systems Leasing Int'l, Inc., 905 P.2d 559, 563 (Ariz. Ct. App. 1995) (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988)).

Plaintiffs have offered no evidence that suggests that defendants' conduct was extreme and outrageous.  Contrary to plaintiffs' contention, the fact that Duffy may have snubbed Stilwell for a period of 15 months is not evidence of extreme and outrageous behavior.   None of the conduct in this case rises to the level of extreme and outrageous behavior.  Defendants are entitled to summary judgment on this claim.

<u>Eleventh Claim for Relief:  negligent infliction of emotional distress</u>

Under Arizona law, a plaintiff has a cognizable NIED claim against another if:

> "(a) [the tortfeasor] should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

> (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm."

<u>Carboun v. City of Chandler</u>, Case No. CV032146PHXDGC, 2005 WL 2408294, at *12 (D. Ariz. Sept. 27, 2005 (quoting <u>Restatement (Second) of Torts</u>, § 313).  Plaintiffs argue that the facts support an NIED claim because they have alleged that they suffered long term emotional distress and defendants have not pointed to any evidence to the contrary.

Plaintiffs have offered no evidence that suggests that they suffered long term emotional distress because of defendants' conduct.  Moreover, the conduct in this case is

not the kind that involves an unreasonable risk of causing emotional distress.  Defendants are entitled to summary judgment on this claim.

<u>Fourteenth Claim for Relief:  Slander against Fuller</u>

Plaintiffs allege that Fuller's comments to the CM2H Hill employees constituted slander.[154]  "Slander consists of the publication of defamatory matter by spoken words...."[155]  "The elements of defamation of a private person are: publication of a false and defamatory communication concerning a private person or public figure relating to a private matter if, and only if, the defendant knows that the statement is false and defamatory or acts in reckless disregard of the truth or falsity or acts negligently in failing to ascertain the truth or falsity."  <u>Xcentric Ventures, LLC v. Brewington</u>, Case No. 1 CA–CV 11–0042, 2011 WL 6747458, at *6 (Ariz. Ct. App. Dec. 22, 2011) (citing <u>Peagler v. Phoenix Newspapers, Inc.</u>, 560 P.2d 1216, 1222 (Ariz. 1977)).

Even assuming that Fuller made the statements to the three CM2H Hill employees that they aver she did, plaintiffs' slander claim against her still fails.  Fuller was expressing her opinion about Stilwell.  Statements of opinion can be actionable if they imply a false assertion of fact.  <u>Yetman v. English</u>, 811 P.2d 323, 327 (Ariz. 1991).  But, a statement of opinion is not actionable if "(1) it could not reasonably be interpreted as stating actual fact;

---

[154]First Amended Complaint at 18-19, ¶ 69, Docket No. 18.

[155]<u>Restatement (Second) of Torts</u> § 568(2) (1977).

or (2) it is not provable as false."  <u>Saban v. Maricopa County</u>, Case No. 1 CA-CV 08-0607, 2010 WL 2977553, at *8 (Ariz. Ct. App. July 29, 2010) (citing <u>Yetman</u>, 811 P.2d at 328).  In determining whether an opinion is actionable, courts have considered "(1) an analysis of the common usage or meaning of the language of the challenged statements, (2) the statement's verifiability, (3) the full context of the statement, that is, the entire article, and (4) the broader context or setting in which the statement appears."  <u>AMCOR Inv. Corp. v. Cox Ariz. Publications Inc.</u>, 764 P.2d 327, 331 (Ariz. Ct. App. 1988).  Fuller's statements were nothing more than her opinion, and they did not contain verifiable facts.   Fuller is entitled to summary judgment on plaintiffs' slander claim against her.

<u>Fifteenth Claim for Relief:  Libel</u>

"Libel consists of the publication of defamatory matter by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words."[156]  Plaintiffs' libel claim is based on the August 1, 2011 letter that was sent to ADEQ in which Duffy stated that Stilwell was responsible for falsifying test results.  Although the letter was signed by Duffy on behalf of the City, plaintiffs allege that Pruett and Fuller were involved in the mailing of the letter as well.[156]

---

[156]<u>Restatement (Second) of Torts</u> § 568(1) (1977).

[156]First Amended Complaint at 12, ¶ 46, Docket No. 18.

As set out above, "[t]he elements of defamation of a private person are: publication of a false and defamatory communication concerning a private person or public figure relating to a private matter if, and only if, the defendant knows that the statement is false and defamatory or acts in reckless disregard of the truth or falsity or acts negligently in failing to ascertain the truth or falsity." <u>Xcentric Ventures</u>, 2011 WL 6747458, at *6. "The First Amendment protections accorded to speech 'regarding matters of public concern,' however, require that a plaintiff prove the statement was made with actual malice-that is the statement must be 'provable as false before a defamation action can lie.'" <u>Holm v. Lincoln & Continental Owners Club</u>, Case No. 2 CA-CV 2010-0035, 2010 WL 3894623, at *3 (Ariz. Ct. App. Oct. 5, 2010) (quoting <u>Turner v. Devlin</u>, 848 P.2d 286, 290 (Ariz. 1993)).

Plaintiffs' libel claim fails because the August 2011 letter was both by and about public officials. In addition, there is no evidence that the challenged statements were made with actual malice. "The actual malice standard is reached when there is clear and convincing evidence that defendant published either knowing that the [statements were] false and defamatory or that it published with 'reckless disregard of whether [they were] false or not.'" <u>Dombey v. Phoenix Newspapers, Inc.</u>, 724 P.2d 562, 573 (Ariz. 1986) (quoting <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-86 (1964)). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." <u>Id.</u> (quoting <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731–32

-55-

(1968) (emphasis added)).  "Actual malice ... is not established through a showing of bad motives or personal ill-will."  Heuisler v. Phoenix Newspapers, Inc., 812 P.2d 1096, 1100 (Ariz. Ct. App. 1991).  For example, in Heuisler, the court found Heuisler's evidence of actual malice insufficient because he "attempted to rest his claim of actual malice primarily upon evidence that Murphy was 'out to get him.'"  Id.

Plaintiffs argue that there is sufficient evidence that suggests that Duffy may have acted with actual malice.  Plaintiffs argue that Duffy knew or should have known that the statements in the letter were false.  They also argue that Duffy's ill-will toward Stilwell is evidence of actual malice.  Plaintiffs also argue that it is significant that Duffy sent the letter seven months after Stilwell was terminated.  They argue that this creates an inference that Duffy was acting out of malice, and not for the good of the City.

Plaintiffs' arguments boil down to a contention that Duffy was "out to get" Stilwell.  But the fact that Duffy might have been "out to get" Stilwell is not sufficient to create an issue of triable fact as to actual malice.  Thus, the City and Duffy are entitled to summary judgment on this claim.

As for Pruett and Fuller, plaintiffs have offered no evidence that suggests that they were involved in the drafting or sending of the August 2011 letter.  While Pruett and Fuller sent the April 2011 email about the buried pipe to the ADEQ, that was not the focus of the August 2011 letter.  Rather, that letter focused on the falsification of testing results.  Thus,

Pruett and Fuller are entitled to summary judgment on this claim.  Cornwell is also entitled

to summary judgment on this claim as there is no evidence that he was involved in the

August 2011 letter at all.

<u>Sixteenth Claim for Relief:  False light invasion of privacy</u>

Arizona has "recognize[d] the distinct tort of false light invasion of privacy as

articulated by Restatement § 652E."  <u>Godbehere v. Phoenix Newspapers, Inc.</u>, 783 P.2d 781,

788 (Ariz. 1989).  Section 652E provides:

> One who gives publicity to a matter concerning another that
> places the other before the public in a false light is subject to
> liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed
> > would be highly offensive to a reasonable per-
> > son, and
> >
> > (b) the actor had knowledge of or acted in reck-
> > less disregard as to the falsity of the publicized
> > matter and the false light in which the other
> > would be placed.[157]

"[A] defendant in a false-light case cannot be liable 'unless the publication places the

plaintiff in a false light highly offensive to a reasonable person.'"  <u>Reynolds v. Reynolds</u>,

294 P.3d 151, 156 (Ariz. Ct. App. 2013) (quoting <u>Godbehere</u>, 783 P.2d at 786).  "{A] plaintiff

cannot sue for false light invasion of privacy if he or she is a public official <u>and</u> the

---

[157]<u>Restatement (Second) of Torts</u> § 652E (1977).

publication relates to performance of his or her public life or duties." Godbehere, 783 P.2d at 789.

Plaintiffs' false light claim is based on the statements made in the August 2011 letter to ADEQ. The fact that Stilwell was not a public official at the time these statements were made is irrelevant. What matters is that he was a public official at the time the acts discussed in the letter took place and that those acts were official acts. Defendants are entitled to summary judgment on this claim because the statements on which it is based related to the manner in which Stilwell performed his public duties.

Conclusion

Defendants' motions for partial summary judgment[158] are granted, and plaintiffs' motion for partial summary judgment is denied.[159] The clerk of court shall enter judgment dismissing plaintiffs' first amended complaint with prejudice.

DATED at Anchorage, Alaska, this 4th day of March, 2014.

/s/ H. Russel Holland
United States District Judge

---

[158]Docket Nos. 145 & 146.

[159]Docket No. 133.